UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANO D. WILLIAMS,

      Plaintiff,                    Case No. 13-13339
                                         Hon. Matthew F. Leitman

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S [13] MOTION
FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
[18] MOTION FOR SUMMARY JUDGMENT**

On January 29, 2010, Plaintiff Deano Williams was employed as a security guard at a high school in Detroit when a group of students attacked him in the school parking lot. According to Plaintiff, the attack left him with nerve damage and intense pain in his right (dominant) hand. Plaintiff also claims to suffer from numerous other ailments, including bipolar disorder and back pain. Unable to return to work, Plaintiff filed an application for disability benefits.

On November 21, 2011, Administrative Law Judge Donald G. D'Amato (the "ALJ") found that Plaintiff was not entitled to benefits. Plaintiff thereafter appealed the ALJ's decision to the Social Security Appeals Council (the "Appeals Council"), which denied Plaintiff's request for review of the ALJ's decision.

1

Plaintiff then filed this action.  Plaintiff and Defendant the Commissioner of Social Security ("the Commissioner") have now filed cross-motions for summary judgment.  (*See* ECF #13 and ECF #18.)  For the reasons set forth below, the Court **GRANTS** the Commissioner's motion for summary judgment (ECF #18) and **DENIES** Plaintiff's motion (ECF #13).

## PROCEDURAL HISTORY

Plaintiff filed an application for "supplemental security income" on May 27, 2010.  (TR at 20.) In his application, Plaintiff alleged that he had been disabled since January 29, 2010.  (*See id.*)  The Commissioner denied benefits on January 26, 2011.  (*See id*.)  Plaintiff retained counsel and requested a *de novo* hearing, which was held on September 21, 2011, before Administrative Law Judge Donald G. D'Amato (the "ALJ").  (*See id.*) [1]

After hearing testimony from Plaintiff and vocational expert Michele Robb, the ALJ found that Plaintiff had "not been under a disability within the meaning of the Social Security Act [(the "Act")], since May 27, 2010, the date the application was filed."   (*Id.*)  As described in more detail below, the ALJ found that Plaintiff

---

[1] This was the second time Plaintiff applied for these benefits.  In 2006, Plaintiff filed a claim for benefits alleging he became disabled on October 29, 2005.  (TR at 25.)  "A requested closed period of disability from March 2, 2007 until March 2, 2008, was granted after a hearing in a decision dated December 2, 2008…"  (the "2008 Decision") (*Id.*)   In the 2008 Decision, it was determined that Plaintiff could perform "light work."  (*Id.*)  For the reasons explained below, though, the ALJ  in this case found that "[t]here is new and material evidence that supports a change in [Plaintiff's] residual functional capacity…" (*Id.* at 25-26.)

was not entitled to benefits for two reasons: (1) even though Plaintiff suffered from numerous "severe impairments" (*id.* at 22), Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the applicable regulations]" (*id.*); and (2) "jobs … exist in significant numbers in the national economy that [Plaintiff] can perform…" (*Id.* at 32.)

On December 21, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision.  (*Id.* at 14.)  The Appeals Council, however, "found no reason under [the] rules to review the [ALJ's] decision."  (*Id.* at 1.).  Plaintiff subsequently filed this action and the parties filed cross-motions for summary judgment. (*See* ECF #13 and ECF #18.)

## APPLICABLE LAW

### A.    Framework for Social Security Determinations

"The Act entitles [] benefits payments [to] certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in 'substantial gainful activity.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (*quoting* 42 U.S.C. § 423(d)(1)(A)). A claimant qualifies as disabled "if she cannot, in light of her age, education, and work experience, 'engage in any other kind of substantial

gainful work which exists in the national economy.'" *Id* (*quoting* 42 U.S.C. § 423(d)(2)(A)).

Under the authority of the Act, the Social Security Administration (the "SSA") has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The five steps are as follows:

> In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. [20 C.F.R.] § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.

> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

4

In the fourth step, the SSA evaluates claimant's "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.;* § 404.1560(c)(1).

*Combs,* 459 F.3d at 642–43. "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that [ ]he is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). If the analysis reaches the fifth step, the burden transfers to the Commissioner. *See Combs*, 459 F.3d at 643. At that point, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her [residual functional capacity ("RFC")] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

5

**B.      This Court's Standard of Review**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited:  the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.,* 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007), *quoting Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994).  If substantial evidence supports the Commissioner's decision, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (internal citations omitted); *see also* Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes ... a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## RELEVANT FACTUAL BACKGROUND

### A.    Plaintiff's and Vocational Expert's  Testimony

### *1. Plaintiff's Testimony*

At the administrative hearing before the ALJ, Plaintiff testified that in early 2010, he "was working for a company that generally did a lot of high-school security." (TR at 44.) Plaintiff told the ALJ that while working at a high school in Detroit, he had a "very violent, verbal confrontation" with the operator of the school, after which the operator told Plaintiff "to leave his building." (*Id.* at 44-45). Plaintiff testified that as he was walking to "the parking lot to get to [his] vehicle … probably 10 or 15 students rushed out of there and ran at [him], surrounding [him] in the parking lot…" (*Id.* at 45.) Plaintiff said that the students

7

then "charged" him and that he "got hit in the head." (*Id.*)   Plaintiff also claimed

that he "lost nerve damage in [his] hand from [the attack]."  (*Id.*)  Plaintiff testified

that the injury to his right "hand is the real problem because [he's] right handed

…And from what the [] – hand specialist and everybody telling [sic] [him] that in

order for them to repair it, they would have to insert a rod in the tip of [Plaintiff's]

finger to the knuckle for probably six months to a year.  And that may not cure it."

(*Id.* at 50-51.)  Plaintiff said that his "hand bothers [him] a lot" and that his pain is

"probably about a six [out of a scale of ten] …with the medication [he was

prescribed to control the pain].  Without it, probably a nine."  (*Id.*)

Plaintiff also identified myriad other medical conditions when testifying

before the ALJ.  Among other ailments, Plaintiff told the ALJ that he has "deep

vein thrombosis" in his left leg and that in 2009 he had "clots in [his] leg" as a

result of the condition.  (*Id.* at 46.)  Plaintiff also testified that he has "aches and

pains here and there" due to carpel tunnel syndrome (*id.* at 47), that he suffers from

back and buttocks pain due to arthritis and "deteriorating" discs (*id.* at 47-48; 53-

54), that he has diagnosed high blood pressure, heartburn and acid reflux (*id.* at

51), that he has undiagnosed issues with his liver (*id.* at 55-56), and that he was

told he has bipolar disorder (*id.* at 46).

8

As a result of these conditions, Plaintiff told the ALJ that on a typical day he "gets up, takes [his] medications, eat[s] a little bit, sit[s] around, watch[es] TV, fall[s] asleep, take[s] [his] naps, get[s] back up, tr[ies] to eat a little something, sit[s] around for a minute, take[s] [his] medication, and [goes] back to sleeping again." (*Id.* at 53.) Plaintiff said that due to his medication, his naps "generally" last for "about an hour, two hours, three hours." (*Id*. at 54.) As Plaintiff described it to the ALJ, he "do[es] mostly what [his] dog do[es]. When he go[es] to sleep, [Plaintiff] sleep[s], and [the dog] sleep[s] mostly all day." (*Id.* at 55.) Plaintiff also remarked that when he "sit[s] long period of time, [his] back starts getting stiff and sore." (*Id.* at 48.) Finally, Plaintiff explained to the ALJ that "a lot of times … [he] yell[s] a lot and [] get[s] angry a lot. And [Plaintiff] know[s] it's because a lot of stuff that [he's] been going through and [his] health conditions …. It's hard for [him] to really get along with people a lot." (*Id.* at 52.)

## 2. *Vocational Expert's Testimony*

At Plaintiff's hearing, the ALJ heard testimony from vocational expert Michelle Robb ("Robb") in order to determine whether there would be jobs available for a hypothetical person with functional limitations that the ALJ thought were similar to Plaintiff's. Robb first testified that Plaintiff did not have any past relevant work for purposes of her analysis, and the ALJ, "based on [a] review of the earnings record," agreed. (*See id.* at 59.) She was then asked if there were

"any jobs in the regional and national economy" that a hypothetical person could perform if that person had Plaintiff's "age, education, and past work experience" and had limitations similar to Plaintiff (such as requiring "simple and unskilled" work in a "low-stress environment," and a work environment in which the person would need to sit or stand "for only 15 minutes at a time" before changing positions). (*Id.* at 59-60). Robb responded affirmatively, testifying that "there would be some examples at the light, unskilled level" including "general office clerk," "some bench assembly positions," and "file clerk" positions. (*Id.* at 60.) The ALJ also asked Robb if there were any positions for "sedentary" individuals, and Robb again testified that there were. (*Id.* at 61.)

During questioning from Plaintiff's counsel, Robb testified that no jobs would be available if the hypotheticals the ALJ posed to her included either (1) a restriction that the person needed to be "off task at least one hour per eight-hour day" or (2) an allowance for the person to "miss greater than two workdays per month." (*Id.* at 61-62.) Finally, Robb agreed with Plaintiff's counsel that no jobs would be available to the hypothetical person discussed in her testimony if the person needed to "nap twice each day, ranging from an hour to two hours each time, in addition to normal breaks." (*Id.* at 62-63.)

10

**B.    The ALJ's Findings and Relevant Medical Evidence**[2]

The ALJ issued a detailed opinion on November 21, 2011, in which the he held that "[a]fter careful consideration of all the evidence … claimant has not been under a disability within the meaning of the [SSA] since May 27, 2010, the date the application was filed."  (*Id.* at 20.)   The ALJ reached this conclusion after progressing through each of the five-steps of the evaluation process.

First, the ALJ determined that "claimant has not engaged in substantial gainful activity since May 27, 2010, the application date."  (*Id.* at 22.)   He then determined that the claimant had a number of "severe impairments" that "have more than a minimal effect on the claimant's ability to perform basic work-related activities."  (*Id.*)   These "severe impairments" included, but were not limited to, a "history of assault to the right upper extremity," "history of degenerative arthritis of the lumbar spine," "bipolar disorder," and "adjustment disorder with mixed emotional features."  (*Id.*)

Despite these "severe impairments," in stage three of the evaluation process, the ALJ held that none of the impairments, or their combination, "equals the severity" of one of the SSA's special list of impairments.  (*Id.*)   In other words, the ALJ found that Plaintiff was not conclusively presumed disabled.  The ALJ spent considerable time in this section of his opinion detailing Plaintiff's medical records

---

[2] The Court has conducted an independent review of Plaintiff's medical records and will incorporate comments and citations as necessary throughout this opinion.

and explaining why his impairments, while severe, did not satisfy the statutory definition of disability that would entitle Plaintiff to benefits. (*Id.* at 22-24.) For example, the ALJ found that Plaintiff's "upper extremity impairments" did not qualify under the relevant standards because Plaintiff "is able to perform fine and gross movements effectively as defined in the regulations." (*Id.* at 22.) Likewise, the ALJ determined that Plaintiff's "mental impairments" (such as Plaintiff's diagnosed bipolar disorder) did not qualify because, among other things, Plaintiff "has reported that he is able to take care of his basic needs, do light housework, and do light cleaning. Therefore, there are only mild limitations with respect to activities of daily living." (*Id.*) The ALJ did note, though, that Plaintiff had "moderate difficulties" with "social functioning" and "concentration, persistence, and pace," but none of these impairments qualified Plaintiff for benefits under step three. (*Id.*)

The ALJ then moved to step four of the evaluation and determined Plaintiff's RFC. (*See id.* at 25-32.) This review again included a detailed and thorough consideration of "all [of Plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…". (*Id.* at 26.) After "careful consideration of the entire round," the ALJ found that Plaintiff :

12

[R]equires work that is simple and unskilled, with one-, two-, or three step instructions, occasionally in close proximity to coworkers and supervisors (meaning that the claimant can occasionally function as a member of a team) and occasionally in direct contact with the public, in a "low stress" environment defined as having only occasional changes in the work setting; can lift and/or carry 10 pounds frequently and 20 pounds occasionally;' can stand and/or walk with normal breaks for a total of four hours in an eight-hour workday, but can do so for only 15 minutes at a time; can perform pushing and pulling motions with the upper extremities, and right lower extremities within the aforementioned weight restrictions, but can do so only occasionally with the left lower extremity; can perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching for 2/3 of an 8-hour workday; need to avoid hazards in the workplace such as moving machinery and unprotected heights; need to avoid vibrations; needs to be restricted to a work environment with stable temperatures, stable humidity, and good ventilation; and can occasionally climb stairs with handrails, balance, stoop, crouch, kneel, and crawl, but needs to avoid climbing ladders, scaffolds, and ropes.

(*Id.* at 25.)

In the section of his opinion discussing Plaintiff's RFC, the ALJ summarized, but did not credit, Plaintiff's testimony regarding some of his claimed symptoms. The ALJ explained that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment. The [Plaintiff's] allegations are deemed

13

not fully credible because … the objective evidence does not support the severity of the symptoms and limitations claimed." (*Id.* at 27.)  Specifically, the ALJ cited Plaintiff's "lack of treatment for his allegedly disabling impairments" as "suggest[ing] that [Plaintiff's] symptoms and limitations are not as severe as he claims." (*Id.*)

The ALJ cited other inconsistences as well.  For example, the ALJ found that Plaintiff, while working as a security guard, had to "stand/walk for nine of the 10 hours" he worked.  (*Id.* at 28.)  "There [was] no suggestion that the [Plaintiff's] ability to perform the standing and walking requirements of his job were in any way hampered by his history of hypertension or left lower extremity DVT." (*Id.*) The ALJ found this "remarkable given that the [Plaintiff] was not being treated for [those] conditions at [that] time." (*Id.*)  The ALJ also found that despite Plaintiff's claim that the injuries to his right hand caused him to be disabled, that Plaintiff "reported that a hand doctor advised him to do hand exercises with a rubber ball, but admitted that he did not receive any physical therapy and did not take any medications for his complaints of some residual soreness, numbness, tingling, and clumsiness in the right hand."  (*Id.* at 29.)  Finally, the ALJ found that while

14

Plaintiff "claims that he is unable to work due to depression[,]" that Plaintiff "has never sought or received treatment for mental health issues." (*Id.* at 29.)[3]

Finally, in step five of the evaluation process, the ALJ determined that "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform…" (*Id.* at 32.)  In this stage, the ALJ credited the vocational expert's testimony that a hypothetical person with Plaintiff's limitations "would be able to perform the requirements of representative occupations such as: General office clerk  … Bench assembler … and File clerk…" (*Id.*)  The ALJ therefore concluded that "[a] finding of 'not disabled' is therefore appropriate under the framework…" (*Id.*)

## ANALYSIS

Plaintiff claims that the ALJ committed three errors in concluding that Plaintiff was not disabled.  First, Plaintiff asserts that the ALJ's "finding that the Plaintiff can perform a limited range of light work is not supported by substantial evidence." (*See* Pla.'s Br., ECF #13, at 9-12.)  Second, Plaintiff alleges that "[t]he

---

[3] In this section of his opinion, the ALJ also considered evidence from Plaintiff's "primary care physician" and reports from "examining psychiatrists." (*Id.* at 31-32.)  The ALJ gave Plaintiff's primary care doctor's opinions "minimal weight" because, among other things, these opinions were not supported by "objective evidence" and the doctor had only "treated [Plaintiff] on two occasions with progress notes totaling four pages." (*Id.* at 31.)  The two psychiatrist opinions were given "modest weight" and "minimal weight" respectively. (*Id.* at 31-32.)

15

ALJ committed reversible error in relying on an unsigned report of a consulting physician, despite agency requirements." (*Id.* at 13-14.)  Finally, Plaintiff says that "[t]he ALJ erred when he failed to properly assess the [P]laintiff's mental RFC as required by agency regulations." (*Id.* at 14-17.)  Having reviewed the record, including the ALJ's detailed opinion and the related medical evidence, the Court finds none of these arguments persuasive.  It will therefore deny Plaintiff's motion for summary judgment and grant Defendant's.

### A.    Substantial Evidence Supports the ALJ's Finding That Plaintiff Can Perform a Limited Range of Light Work

Plaintiff first argues that "the ALJ's opinion concerning [Plaintiff's RFC] in relationship to his right hand is inconsistent with his medical condition and directly contradicts the testimony and evidence presented at the hearing." (*Id.* at 11.) Plaintiff therefore contends that the ALJ's determination that Plaintiff "was capable of a limited range of light work … [was] not supported by the requisite substantial evidence…" (*Id.* at 9.)

Based on its review of the record, the Court believes that the ALJ properly examined the medical evidence with respect to Plaintiff's hand injury and that substantial evidence supports the ALJ's determination that Plaintiff is able to perform a limited range of light work.  As the ALJ aptly pointed out, when Plaintiff was seen in an emergency room shortly after the attack he claims led to his disability, "[x]-rays of [Plaintiff's] right hand, wrist, forearm, elbow, shoulder,

16

and occipital orbits were ordered.  They were all negative, showing no fractures, dislocations, or soft tissue abnormalities." (TR at 29.)  Furthermore, during a 2011 examination by Dr. Leonidas Rojas, Plaintiff "admitted that he did not receive any physical therapy and did not take any medications for his complaints of some residual soreness … in the right hand" and "[o]n examination of the right hand, there were no gross deformities, swelling, tenderness, or restriction." (*Id.*; *see also* TR at 409-410)  At this examination, Plaintiff was "able to perform fine and gross manipulation, and his grip strength in his right hand was actually greater than his left hand." (*Id.*)  The medical evidence therefore supports the ALJ's finding that Plaintiff's "lack of treatment coupled with minimal objective abnormalities on examination bear negatively on the [Plaintiff's] allegation of disability." (*Id.* at 29.)

The Court also rejects Plaintiff's argument that the ALJ erred in failing to credit his testimony that the medication he takes to control the pain related to his hand injury causes him to "nap" for multiple hours each day. (*Id.* at 53-54.)  As the ALJ found, the medical record is inconsistent with this testimony.  Specifically, these records show that when Dr. Rojas examined him in 2011, Plaintiff said he "does not take medication." (*Id.* at 409.)  Furthermore, in both Dr. Rojas' examination and an examination performed in 2011 by psychologist Ibrahim Youssef, Plaintiff apparently did not indicate that he needed to nap multiple hours per day. (*Id.* at 409-410; 416-418.)

17

This Court is hesitant to disturb the ALJ's rejection of Plaintiff's testimony because "there seem[s] to be demonstrable discrepancies between what the [Plaintiff] said on the stand and what the written record shows." *Gooch v. Sec'y of Health and Human Svcs.*, 833 F.2d 589, 592 (6th Cir. 1987). In addition, an ALJ's credibility determination is due "great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 153 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle"). In this action, the ALJ observed Plaintiff's testimony, including testimony about his level of pain and need to nap on a daily basis, weighed that testimony against the record medical evidence, and credited the medical record over Plaintiff's testimony. The Court therefore rejects Plaintiff's claim that the ALJ's conclusion was not supported by substantial evidence.

Finally, Plaintiff alleges that the vocational expert's testimony "directly contradicted" the ALJ's finding that Plaintiff could perform a limited range of light work. (Pla's. Br. at 12.) Plaintiff reaches this conclusion based on the vocational expert's testimony that, if a hypothetical person needed to have "1 hour off per 8 hour day" or "needed to miss 2 or more days of work per month" (two restrictions Plaintiff alleges he has), then "there were no jobs available that could

accommodate those restrictions." (*Id.*)  As described above, however, the ALJ did not find Plaintiff's testimony that he needed to nap during the day credible. Therefore, the vocational expert's testimony regarding a hypothetical need to have "1 hour off per 8 hour day" was not relevant, and the ALJ's determination was not contrary to the vocational expert's testimony.

### B.  The ALJ Did Not Improperly Rely on an Unsigned Report of a Consulting Physician

Plaintiff's second claimed error is that, contrary to the applicable regulations, the ALJ wrongly "reli[ed] [on] an unsigned report of a consulting physician" when determining Plaintiff's RFC.  (Pla.'s Br. at 13.)   Plaintiff's argument, though, has myriad fatal flaws.  Among other faults, as Plaintiff was forced to admit in his brief (*see id.*), the subject report actually *is* signed in three different places.  (*See* TR. at 208, 210, and 212.)  Plaintiff's inability to read the signatures (all of which appear to be from the same person) does not render them in violation of any applicable rule or regulation.  In addition, as Defendant rightly points out (*see* Def.'s Br., ECF #18, at 10-11), the referenced report is from 2006, four years *before* Plaintiff's claimed disability.  While the ALJ did cite to the report in his opinion, his decision did not rest on that report.  Indeed, as the ALJ detailed in his opinion, there was ample medical evidence, besides the report, that supported the ALJ's decision, nearly all of it more recent than the 2006 report which forms the basis of Plaintiff's alleged error.  The Court therefore finds no

basis to reverse the ALJ's ruling on the basis he improperly relied upon the 2006 report.

### C.   The ALJ Did Not Fail to Properly Assess Plaintiff's Mental Residual Functional Capacity

Plaintiff's final claim of error is that the ALJ did not follow certain applicable regulations when he assessed Plaintiff's mental RFC.  (*See* Pla.'s Br. at 14-17.)   First, Plaintiff alleges that "the ALJ failed to express the Plaintiff's abilities in terms of work related functions."   (*Id.* at 15.) Specifically, Plaintiff claims that the ALJ "did not properly evaluate Plaintiff's mental impairment pursuant to SSR 96-8p and SSR 85-15."[4] (*Id.*)   Plaintiff asserts that the ALJ violated these regulations when the ALJ failed to, among other things, "address[ Plaintiff's] ability to understand, carry-out, and remember instructions … respond to supervision … [and] deal with changes in a routine work setting."  (*Id.*)

The Court rejects Plaintiff's claims.  For example, it is clear from the ALJ's determination of Plaintiff's RFC that the ALJ in fact considered and took into account each of the above-cited factors.  The ALJ determined that Plaintiff needed work that was "simple and unskilled, with one-, two-, or three-step instructions …in close proximity to coworkers and supervisors … in a 'low stress' environment

---

[4] These regulations state that "work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry-out,  and remember instructions … respond appropriately to supervision, co-workers' and work situations; and deal with changes in a routine work setting."  (Pla.'s Br. at 14, *quoting* SSR 96-8p and SSR 85-15.)

defined as having only occasional changes in the work setting." (*Id.* at 30). The ALJ could not have made these determinations without considering the factors Plaintiff claims the ALJ ignored. Indeed, the ALJ specifically outlined that "[t]he restriction to unskilled work in a low stress environment with limited social demands are based on the claimant's mental impairments and his testimony regarding anger and difficulty getting along with others." (TR at 31.)[5] The ALJ also acknowledged that Plaintiff had "moderate difficulties" with "social functioning" and "concentration, persistence, and pace," (*id.* at 22) and those factors were taken into account in the ALJ's decision of Plaintiff's mental RFC.

Indeed, in the ALJ's comprehensive opinion, it is readily apparent that the ALJ took into account Plaintiff's mental impairments when determining Plaintiff's RFC. The ALJ specifically found that Plaintiff's capacity contained "restrictions [that were] greater than those determined in [the 2008 Decision] and are based on [Plaintiff's] new … mental impairments." (TR at 30.) Thus, not only did the ALJ fully examine and take into consideration Plaintiff's mental impairments when determining Plaintiff's RFC, these impairments led to a more favorable (i.e. more restrictive) RFC than Plaintiff was determined to have in 2008.

---

[5] Plaintiff also claims that the ALJ improperly determined Plaintiff's mental impairment was not severe (*see* Pla.'s Br. at 15-16), but the ALJ determined that Plaintiff in fact had multiple "severe impairments" including "severe impairments" related to his "bipolar disorder," "adjustment disorder with mixed emotional features," and "personality disorder." (TR at 22.)

21

Finally, Plaintiff claims that his "ability to work has been severely over-estimated, resulting in an erroneous finding that he retains the ability to perform light work. The ALJ ignored Plaintiff's numerous additional significant symptoms when determining that he could work as a general office clerk, bench assembler or file clerk." (Pla.'s Br. at 16.)  Plaintiff posits that "[t]he ALJ seems to have ignored the additional hypotheticals posed to the [vocational expert], which asked if plaintiff would be able to work if it was necessary for him to nap." (*Id.*)

As detailed above, though, where there is substantial evidence to support the ALJ's decision, as there is here, this Court cannot reverse that judgment "even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286.  For all of the reasons explained in this Opinion, the ALJ's findings were supported by substantial evidence and the Court will not disrupt his findings.

## <u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF #18) and **DENIES** Plaintiff's Motion for Summary Judgment (ECF #13).

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 2, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 2, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113